# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 22, 2012 Session

## STATE OF TENNESSEE v. ROBERT W. HAWKINS

**Appeal from the Circuit Court of Stewart County**
**No. 4-2062-CR-09     Robert Burch, Judge**

---

**No. M2011-00531-CCA-R3-CD Filed October 17, 2012**

---

Robert W. Hawkins ("the Defendant") was convicted by a jury of one count of aggravated assault with a deadly weapon and one count of aggravated assault resulting in serious bodily injury. The trial court merged the two convictions into the conviction of aggravated assault with a deadly weapon. Following a sentencing hearing, the trial court sentenced the Defendant as a Range I standard offender to a term of five years, with one year to be served in confinement and the remainder on probation. The Defendant now appeals, challenging the sufficiency of the evidence and arguing that the trial court improperly commented on the motivation of the Defendant during his testimony. He also alleges that the trial court should have sentenced him to full probation. Upon our thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Michael J. Flanagan, Nashville, Tennessee (on appeal); and J. Runyon, Clarksville, Tennessee (at trial), for the appellant, Robert W. Hawkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Suzanne Lockert-Mash, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The Defendant was indicted on one count of aggravated assault with a deadly weapon, a Class C felony, and one count of aggravated assault resulting in serious bodily injury, a Class C felony. His charges arose out of an incident on December 26, 2008, in which the Defendant hit his neighbor, John Thompson, with a stick.

*Proof at Trial*

John Thompson, the victim, testified at trial that on the night of December 26, 2008, he was at home with his family. He estimated that he had consumed approximately six to eight beers since sometime after lunch until late that evening. John[1] explained that he owns a field adjacent to his residence that his family uses as a track for go-carts, four-wheelers, and dirt bikes. That night, his friend, Phillip Gregory, was at his residence and drove John's four-wheeler once around the track. To John's knowledge, no one else had driven on the track earlier in the day. Immediately thereafter, John drove the four-wheeler around the track. As he did so, he heard the Defendant's family, who lived next door, yelling at him to stop because they "were trying to do something over [there]." John stated that this request was the first time ever that the Hawkins had asked him to put away his four-wheeler. However, on cross-examination, John stated that the Defendant had spoken to him once a few months prior about some neighbors who drove on the track and then drove through the Defendant's yard.

Sometime after 10:00 p.m., a friend of no blood relation, Frankie Thompson, came over to John's residence. Frankie mentioned that he never had driven on the track and requested to do so with his Chevrolet Blazer. John, John's son, and John's stepsons got in the car with Frankie, and Frankie proceeded to drive around the track. On their first loop of the track, the Blazer got stuck in the mud. John noticed approximately eight to ten people standing at the property boundary dividing John's land and the Defendant's land who were "cussing and hollering, flipping off, just yelling."

At this point, John stepped out of the passenger side of the vehicle and urinated. He stated that the Hawkins were standing on the driver's side of the vehicle. Then, he observed the Defendant approaching, and John told the Defendant that he would get the Blazer out and not make another "peep." John heard more yelling from the Defendant's family and noticed

---

[1] Because many of the witnesses in this case share a common surname, we will refer to them using their given names only. We intend no disrespect.

a stick in the Defendant's hand. John admitted that he might have yelled back but stated that he "wasn't mad enough to throw rocks at anybody." He denied making "cat calls" or threats toward the Defendant's wife, and although he did not remember doing so, he "very well could have" called her a "b***h." John turned around to begin walking toward his residence, and he heard someone ask what time it was. He pulled out his phone, told the time, and then turned around again. The next thing he remembered was that he woke up and realized that Frankie and Sandy Burton were carrying him through the field and that he was bleeding.

As John regained awareness of his surroundings, he heard a "crunch" in his ear, and he grabbed his jaw and immediately knew that it was broken. He also saw two big bruises forming across his chest. When police officers arrived, the "chaos" from the Hawkins broke out again. As the officers handcuffed the Defendant and placed him in the back of the patrol car, John heard the Defendant's wife yell that "bullets [we]re going to fly across the field" and that she did not care whether John's kids were outside.

John sought medical treatment that evening and was referred to Vanderbilt University Medical Center ("Vanderbilt") where he underwent jaw surgery and received two titanium plates. His jaw was wired shut for three months. His pain was, and continues to be, extreme.

Phillip Gregory, an acquaintance of both John and the Defendant, testified that on December 26, 2008, he had spent time with John throughout the day. Gregory arrived at John's home at approximately 10:00 p.m. He only remembered John, John's wife, and John's kids being present. John was trying to sell a four-wheeler, and Gregory drove it around John's track. Gregory could not remember whether people were outside on the Defendant's property while Gregory drove the four-wheeler, but he denied having any interference from the Defendant's family. Once Gregory brought the four-wheeler back to John, John mounted the four-wheeler and drove it around the track a few times. Gregory noticed some people outside on the Defendant's property while John circled the track. Although he could not understand what was being said, Gregory could hear people talking but did not believe that any type of altercation or fight broke out.

Gregory recalled that John returned from the track around the same time that Frankie Thompson arrived at John's residence. John and several kids then got into Frankie's Blazer, and Frankie began to drive around the track. At some point, the Blazer got stuck in the mud. John stepped out of the car, and "[s]omebody from the other side asked what time it was, he stopped and told them . . . , and then [the Defendant] walked around to that side and he hit [John] with a stick three times."

Gregory stated that the Defendant first struck John in the jaw while John was in the process of turning back toward his house. After the first hit, John fell to the ground, and the

Defendant hit him two more times. Gregory did not recall seeing John threaten the Defendant or the Defendant's family.

On cross-examination, Gregory denied seeing John urinate when he stepped out of the Blazer. He could not remember whether John or any of John's guests had been drinking. Gregory knew that he had not been drinking that evening because he was driving. He did not recall hearing the Defendant's family talk about an altercation that occurred earlier in the evening.

Frankie Thompson testified that he had known both John and the Defendant for several years. Around 10:00 p.m. on December 26, 2008, Frankie went over to visit John. Before taking his Blazer around the track, he was unaware of any animosity between the Hawkins and Thompsons that evening. Once the Blazer got stuck and John stepped out of the vehicle, Frankie did not see the Defendant until the Defendant was right behind John. Then he observed the Defendant hit John twice. After John fell to the ground, the Defendant "turned toward [Frankie] and asked . . . if [Frankie] wanted some[,] and [the Defendant] started putting his gut up against [Frankie's], pushing [Frankie] backwards."

Frankie never observed John threaten the Defendant's wife. He also never observed John urinate outside his vehicle. He stated that he was not drinking that evening and that John was not drinking while Frankie was there at his residence.

Sandra Burton testified that she was at the Thompson residence on December 26, 2008. She observed that several people were over on the Defendant's property, and it was loud enough that it seemed like a party. She did not consume alcohol or observe anyone around her consuming alcohol at the Thompson residence. When she observed the Blazer get stuck, she and Gregory started approaching the vehicle. She watched John get out of the vehicle, and she heard a woman yell, "[W]hy are you doing this? Do you know what time it is?" John pulled out his cell phone and responded that it was 10:38 and that he was sorry for being so loud. Immediately thereafter, Burton observed the Defendant hit John across his jaw with a stick and then hit him a couple more times across the chest once John fell to the ground. She remembered yelling at the Defendant and the Defendant's saying, "[D]o you want a piece of this?" According to Burton, the Defendant was directing that statement toward her.

Burton estimated that the Hawkins family had seven or eight people approaching the vehicle around the time that the Defendant hit John. She did not recall any confrontation between the Hawkins and Thompsons prior to the Blazer's getting stuck in the mud.

Carla Thompson, John's wife, testified that she has known the Defendant since she was a little girl. She and her husband had lived close to the Defendant for approximately

three years prior to the incident in 2008. During the course of events that evening, Carla was inside the residence cleaning until Gregory entered the residence to tell her that John had been injured. Carla ran outside to find her husband being dragged toward the house. According to Carla, "[h]e was covered in blood all over his clothes and his jaw was . . . hanging down to his neck."

Once police arrived and arrested the Defendant, Carla heard the Defendant's wife yell Carla's name, saying that Carla's grandmother would be disappointed in her and that "there's going to be bullets flying across the field tonight." She also heard the Defendant's wife say that she would shoot any of Carla's children if she caught them out in the yard.

Deputy Jody L. Batton, Stewart County Sheriff's Department, testified that on the night of December 26, 2008, he had been employed with the sheriff's department for approximately a year and a half. When he arrived at the scene, he noticed that John had a swollen jaw with blood coming from his mouth. He observed several other family members and friends at the residence and said that, other than their concern for John, they were all calm and cooperative.

After speaking with the Thompsons, Deputy Batton and Deputy Shoaff walked over to the Defendant's residence to ask some questions. As they reached the residence, they observed a pair of tennis shoes completely covered in mud and "a one by one or one by two stick that was sitting on the other side of the door." When the officers knocked on the door, the Defendant walked outside, but he was accompanied by his family. The officers found it difficult to speak to the Defendant alone. When they questioned the Defendant about the stick, the Defendant got defensive and began telling them that they needed to leave his property. Deputy Batton believed that the Defendant and John had been drinking, based on the smell of alcohol on both of them. He did not notice the odor of alcohol on anyone else at the Thompson residence.

Because the Defendant would not cooperate, Deputy Shoaff placed him under arrest for aggravated assault. However, the Defendant "jerked away from Deputy Shoaff," and the Defendant's family started to surround Deputy Shoaff. At that point, Deputy Batton retrieved his taser and instructed the family to back away. Deputy Batton stated, however, that he did not have to use the taser on anyone that night.

Deputy Batton never heard reports of any threats made by the Thompsons. However, he observed the Defendant's wife scream profanities toward the Thompson residence. According to Deputy Batton, "[s]he was cussing" and yelled, "[B]ullets are going to fly tonight." The officers, as well as her family members, told her several times to calm down and back away from the property line. The officers called another officer to transport the Defendant to jail while they stayed to diffuse the still-escalated situation.

-5-

Deputy Batton testified that the Defendant never admitted that he hit John. The Defendant eventually did admit that he and John exchanged words, but the Defendant claimed that he did so from his own property line.

Deputy Patrick Webber, Stewart County Sheriff's Department, testified that he had been employed with the sheriff's department for approximately two and a half years at the time of the incident. He first arrived at the Thompson residence and then walked over to the Hawkins residence. However, once he reached the officers, they asked him to transport the Defendant, so he retrieved his vehicle and returned to the Hawkins' property. He observed a group of people being very loud at the Hawkins residence. Once he began transporting the Defendant, he inadvertently drove on the Defendant's grass, and the Defendant told him to "get off [his] damn grass." Once they arrived at the jail, the Defendant was cordial because he realized that he knew Officer Webber.

Deputy Josh Shoaff, Stewart County Sheriff's Department, testified that he has been in law enforcement since 2002. When he arrived at the scene with Deputy Batton, he observed John standing in his driveway with blood covering his mouth and shirt. When the officers walked next door to question the Defendant, the Defendant told them that the Thompsons had been out on their four-wheelers for hours. The Defendant also stated that the Thompsons had made several obscene gestures to his wife and that he asked the Thompsons to be quiet. According to the Defendant's statement to the officers, that interaction was the extent of the situation.

Deputy Shoaff continued to question the Defendant about the incident, informing the Defendant that John's face was "messed up pretty bad." At that point, the Defendant became "very uncooperative" and stated that "it's awfully slick out there" and "he probably fell." Deputy Batton picked up the stick located next to the door, and the Defendant became irate, saying, "put that f**king stick down. You don't have a f**king warrant. Get off my f**king property." Meanwhile, the other family members were talking over one another to the point that they were yelling. Deputy Shoaff heard someone state that John had urinated next to the Blazer. At this point, taking into account that the stick fit the description by the Thompsons and that he discovered the muddy shoes, Deputy Shoaff decided he had probable cause to arrest the Defendant.

Deputy Shoaff stated that he knew a family member, Kevin Hawkins, and that he talked with Kevin once the Defendant was arrested and sent to booking. Once the Defendant left, the situation calmed down considerably, and Kevin apologized for the situation "getting out of control." No one in the Hawkins family ever admitted that any type of physical altercation occurred.

After Deputy Shoaff completed his testimony, the State rested its proof. The defense then proceeded with its case-in-chief. Deborah Hawkins, the wife of the Defendant, testified that on December 26, 2008, she was busy in the kitchen preparing for their family Christmas gathering. Her extended family began arriving at approximately 3:00 p.m., and the gathering continued through the evening. Deborah stated that her husband only had one beer and that her sons each drank two or three beers.

Deborah had observed John earlier in the day driving his truck into a pond that was located close to her property. She also recalled that later in the evening members of the Thompson family were outside riding four-wheelers on the dirt track. At one point, her daughter-in-law stepped outside on the front porch, and "the man on the four-wheeler"[2] yelled, "[H]ey, baby you want to have some fun? Don't let a little mud stop you." Deborah stated that the man on the four-wheeler then revved the engine and darted across the field. That man returned a short while later when the Hawkins were all inside and shouted, "[I]f you want some, come get you some." The Defendant reacted to this man's behavior by instructing his family to stay inside.

Shortly thereafter, Deborah took a bag of trash outside to the back of her house. When she stepped outside, she observed her neighbors now driving a sport utility vehicle on the track. She watched the sport utility vehicle eventually get stuck in the mud near a septic line, and she began to approach the vehicle although staying on her property. Deborah attempted to get John's attention by yelling, and when John exited the vehicle he stated, "what the f**k do you want, b***h?" As they shouted back and forth, John "unzipped his pants and urinated in front of [Deborah]." Deborah estimated that she was approximately four feet from the vehicle at that time. Deborah believed that her sons and son-in-law were outside during this verbal exchange but was not sure who else saw John urinate. However, she stated that her son-in-law told the Defendant what had happened, and the Defendant walked past her and told her to go back inside the house.

Once the Defendant returned to the house, he informed Deborah that John "was coming at [the Defendant] with something in [John's] hand," so the Defendant hit John in the face. Deborah's sons and son-in-law were with the Defendant when he approached John, and Deborah did not recall that the Defendant had a stick in his hand. Deborah estimated that from the time she saw the Defendant approaching the vehicle to the time he returned to the house to inform her of the altercation, approximately two minutes had passed. She acknowledged that somehow in that two minutes, the Defendant felt threatened by John, he

___

[2] Although other witnesses later identified this man as John, Deborah did not identify John as the man on the four-wheeler who yelled at her daughter-in-law.

found a stick, and he then hit John with that stick. When her sons returned inside the house, they stated that John had something in his hand, and they identified the object as a beer can.

Deborah acknowledged that the Defendant and the rest of her family never admitted to the police officers that the Defendant struck John with a stick. She stated that when the Defendant told the officers, "well, maybe, he fell down and hit his face on the Blazer that's stuck out there at the side of my yard," the Defendant "was trying to be a smart-aleck[]." Once the officers placed the Defendant under arrest and walked him down the driveway, Deborah heard members of the Thompson family yelling obscenities at them and threatening to bring over a "house warming present." Deborah interpreted that to mean that the Thompsons might burn down her house. Deborah adamantly denied threatening the Thompsons about "bullets flying" that night. However, she stated that she yelled, "Carla Lackey, your grandmother will be ashamed of you[,] and you keep your kids and your dog out of my yard."

The Defendant's testimony largely was consistent with Deborah's testimony. He stated that he heard John yell at his daughter-in-law who was on the front porch. John returned a second time and yelled toward the house. In both instances, the Defendant told his family to come back inside the house, saying "the more audience you give him the worse he's going to get." At some point, the Defendant walked outside to his shop that was located in the back of the house. As he left the house, he observed some commotion occurring close to his property line involving a Blazer stuck in the mud and some of his family members. He walked toward the Blazer, and his son-in-law informed him that John called his wife a "b***h" and urinated in front of her. Somewhere along the way, as the Defendant walked toward the group, he obtained a stick in his hand. He denied having the stick at the time that he first left his shop and approached the Blazer. The Defendant stated that he picked up the stick in order to "steady himself" in the muddy field. He explained that the stick was a piece of edging from a sawmill.

The Defendant instructed Deborah to go back to the house. According to the Defendant, as he approached John, John stated, "'It's my effing land.' At this time [John is] walking toward me. He said, 'it's my "M" effing land, you "M" effer[']; and when he got – at that time he was up on me. He had something shiny in his right hand, so when he got up into my face I just – I hit him with the stick." The Defendant stated that even after John was hit John still "bear hugged" the Defendant but that the Defendant pushed John off of him and hit John again. The Defendant did not know whether John was conscious at the time that he pushed John off of him. The Defendant maintained that he hit John because John "was going to attack [him]." Later, the Defendant learned that the "shiny object" in John's hand was a beer can. He confirmed that he was in fear of serious bodily injury during his confrontation with John.

-8-

On cross-examination, the Defendant acknowledged that he made some threatening statements to Frankie after hitting John. The Defendant did not know whether Frankie might try to attack him. However, he did not hit Frankie because he did not perceive Frankie to be a threat once the Defendant said, "[D]o you want some, too?" The Defendant also agreed that he may have made the same threat to a woman who was present in the field.

Early in the Defendant's testimony, the Defendant made an unsolicited comment that his family believed that John "was on crack cocaine." Following an objection by the State, the trial court warned the Defendant, outside the presence of the jury, to "answer the questions directly, simply and without elaboration. I will hold you in contempt and you will spend tonight in jail if you do another instance just like you have done." On cross-examination, the following interaction took place:

Q: When did you first realize that your wife was there?

A: When Jason approached me coming up the driveway.

Q: I can't hear you.

A: I had throat cancer and my voice don't carry that well. When Jason –

General Lockert-Mash: I'm going to ask to instruct this witness once again not to testify outside of what the question is.

The Court: Ladies and gentlemen, will you step out in the jury room please.

. . . .

The Court: Mr. Hawkins, I have warned you on a previous occasion about making unsolicited comments. I find that you are in direct criminal contempt of the orders of this Court and I fine you fifty dollars. The next time I do it, it's going to involve incarceration.

. . . .

General Lockert-Mash: Your Honor, we'd ask that you instruct the jury to disregard that comment.

. . . .

The Court: Ladies and gentlemen, just before you left the courtroom, this defendant made an unsolicited comment concerning his physical condition. It was not a responsive response to a question asked and it was improper.

You may consider it to have been an attempt on the part of the defendant to incur your sympathy; but I will instruct you that even though that may have negatively affected you, I instruct you to disregard it; and not allow it to affect your verdict one way or the other.

You will be told in your final instructions that you are to arrive at a verdict without sympathy, prejudice or passion, can you do that?

The jury agreed, and the Defendant did not object or request any additional curative instruction.

The Defendant denied that he lied to the police officers when they questioned him about John's injuries, although he confirmed saying that John "might have [fallen in the mud] and hit his head on the bumper of that truck."

Tina Hawkins, the Defendant's daughter-in-law, testified that when her family arrived around 6:00 p.m. on the night of the incident, she observed the neighbors four-wheeling. Then, later in the night, she stepped outside to make a phone call, and someone "started hollering [her] way saying, hey baby – something to that extent and we're just having fun or let's have fun." Tina stayed up near the house throughout the incident, so she did not realize that the Defendant hit John until the Defendant returned to the house. She heard John yelling as he walked toward his residence, and she became scared that he was going to start shooting a gun toward the house.

Butch Reed testified that he lives across the road from the Thompsons and the Hawkins. He stated that in his opinion the Defendant and Deborah are honest people. On cross-examination, he denied that the fact that the Defendant was not truthful about John's injuries would change his opinion of the Defendant.

Rick Joiner testified that he has known the Defendant his entire life. Despite the Defendant's untruthful comments regarding John's injuries, Joiner still believed the Defendant to be an honest person. However, he agreed that if a person hit someone and then gave a different explanation for the injuries such an explanation would be a lie.

Kevin Hawkins testified to many of the same facts to which his wife, Tina, and mother, Deborah, testified. When the Blazer got stuck in the mud, Kevin approached the vehicle with Deborah and witnessed John urinate in front of Deborah. After the altercation

between the Defendant and John, Kevin observed a boy approximately seventeen years old get out of the car. He stated that the boy was smoking a cigarette and drinking a beer.

When the Defendant approached the vehicle, John "was coming in" toward the Defendant, and Kevin thought that John was about to "bull rush" the Defendant and "knock him down in the mud." After the Defendant hit John, Kevin saw John wrap his arms around the Defendant, and the Defendant then knocked John to the ground and "instantly" hit John again. Kevin admitted that, at the point that John urinated in front of Deborah, Kevin had decided that John "was going to get whipped on." Kevin agreed that the Defendant might have hit John more than twice and did not know whether John was conscious when the Defendant hit him. Kevin admitted to getting upset when the officers were in the process of arresting the Defendant. He later apologized to Deputy Shoaff, whom he knew from school, regarding his behavior.

Brian Hawkins, the other son of the Defendant, testified to the same sequence of events as Kevin, his brother. He stated that he witnessed John expose himself and urinate in front of Deborah, his mother. Brian recalled that Kevin and Jason were also present and that, shortly after John urinated, Jason left and returned with the Defendant. Brian observed the Defendant pick up a stick as he made his way into the muddy field. Once John fell to the ground after getting hit by the Defendant, Brian did not see John try to fight back. On cross-examination, Brian admitted that his family discussed before the police officers arrived that none of the family members were going to tell the officers that the Defendant hit John.

Bill Hammons, a friend of the Defendant, testified that he knows the Defendant to be an honest man. Mark Dorch, another friend of the Defendant, testified to the same. On cross-examination, Dorch acknowledged that he, Hammons, and the Defendant are all Masons together. Dorch agreed that it would surprise him that the Defendant would be untruthful regarding John's injuries but maintained that such actions did not change his opinion of the Defendant.

Tara Page, the daughter of the Defendant, testified to many of the same events as the other family members from her perspective of having stayed close to the house. She acknowledged writing the witness statement and having her family members sign it. Tara never saw the Defendant hit John.

Jason Page, Tara's husband, testified to many of the same events as the other Hawkins family members. He denied that the family conspired to not divulge information of the Defendant hitting John prior to the police arriving.

The Defendant was recalled to testify. He stated that he had no knowledge of Kevin's intent to assault John prior to the Defendant's hitting John. He also testified that the only

-11-

extent to which the family collaborated before police officers arrived was that he told his family, "I will do the talking."

At the conclusion of the trial, the jury found the Defendant guilty of both aggravated assault with a deadly weapon and aggravated assault resulting in serious bodily injury. The trial court merged the conviction of aggravated assault resulting in serious bodily injury into the conviction of aggravated assault with a deadly weapon.

*Proof at Sentencing*

Bill Parsons, a Tennessee probation officer, testified that he spoke with the Defendant regarding the incident. He stated that the Defendant seemed sorry for what had happened and did not remember the Defendant's saying that his actions were in self-defense. Parsons also spoke with John Thompson and learned that, due to his injuries, John had to miss work from December 26, 2008 through March 23, 2009. John also gave Parsons copies of three bills from Vanderbilt, which were in the amount of $29,585.04, $12,141.50, and $80.00. Additionally, John had a bill from the Medical Center at Erin of $950.59 and a bill for medication of $243.36.

On cross-examination, Parsons acknowledged that the Defendant had been employed continuously at Trane Company for thirty-four years. Additionally, he confirmed that the Defendant's only prior criminal history was an arrest for a DUI that was reduced to reckless driving in 1996.

John Thompson testified regarding some other medical bills that he did not provide to Parsons, amounting to $7,284.90 and $4,013.41. He stated that in his job he was making $28.50 per hour and working approximately eighty hours per month at the time that he was injured. While he was absent from work, he received 40% of his regular pay as medical leave.

John explained that his jaw was broken and his gum was separated from being hit by the Defendant. He had a procedure during which he had two titanium plates inserted in his chin. He stated that he still has constant pain in the side of his jaw and in his neck. Additionally, he likely will lose a tooth as a result of his injuries, and his gums have receded. John testified that he and his family have been "watching [their] backs" ever since the assault and that the incident has caused him to be depressed and have trouble in his marriage. He stated that he would like for the Defendant to serve jail time, to attend anger management courses, and to pay restitution for John's medical bills.

The Defendant gave an allocution statement in which he apologized to John for the injuries that he caused and to his friends and the community for his behavior. He asked that

the trial court not "make [him] a felon" because doing so would bar him from his involvement with the Freemasons and youth sports. He expressed his desire to support his family.

Mark Dorch testified that he has known the Defendant for years and believed that the Defendant was always "aboveboard." He stated that the Defendant always was willing to help with charitable projects and events in the community and that his children had been well-raised.

Rick Joiner testified that he has known the Defendant since elementary school. He stated that the Defendant is known in the community as a family man and was instrumental in establishing the Stewart County Athletic Association. He knew that the Defendant still took care of his elderly parents. On cross-examination, Joiner acknowledged that the Defendant had a reputation in the community for having a temper. Joiner also was surprised that his family would conspire not to tell police officers that the Defendant beat John with a stick.

The trial court noted its consideration of the sentencing principles and purposes, including the considerations under the Sentencing Reform Act of 1989 for confinement. The court considered the Defendant's allocution statement to carry little weight, stating, "It is simply a device to avoid cross-examination and it speaks to me of insincerity; but I'm required to consider it and I do."

The trial court did not find that the evidence established the application of the mitigating factors that the Defendant acted under strong provocation and that grounds existed to excuse or justify the Defendant's actions. Further, the court found that the Defendant failed to provide sufficient proof to apply the mitigating factor that the Defendant committed the offense under circumstances in which it was unlikely that the "intent to violate the law motivated the criminal conduct."

Regarding enhancement factors, the trial court found that because it merged the conviction of aggravated assault requiring serious bodily injury into the conviction of aggravated assault with a deadly weapon the injuries in this case were well above those necessary to establish aggravated assault with a deadly weapon. Thus, the trial court found that the enhancement factor of serious bodily injury applied and afforded it great weight. The trial court found inapplicable the enhancement factor that the Defendant "had no hesitation about committing a crime in which the risk to human life was high" because this factor is a necessary element of the offense. Taking into account the factors, John's injuries, the surrounding facts, and the pre-sentence report, the trial court sentenced the Defendant to five years. The sentencing range for a Range I standard offender for a Class C felony is between three and six years. Tenn. Code Ann. § 40-35-112(3) (2006).

In determining whether all or part of the sentence should be suspended, the trial court found that suspending the Defendant's sentence in its entirety would depreciate the seriousness of the offense. The trial court found the Defendant's trial testimony untruthful and his statement of allocution unconvincing. Overall, the trial court believed the Defendant lacked remorse for his actions. The court also found that full probation would not be in the best interest of the public but that split confinement would. Accordingly, the trial court held that the Defendant would be required to serve one year and have the rest of his five year sentence suspended. The trial court noted that it was requiring only one year in confinement, as opposed to five years, because it believed that one year would have the same deterrent effect on the Defendant.

For the same reasons it denied full probation, the trial court denied judicial diversion and ordered that the Defendant successfully complete an anger management course. Additionally, the trial court ordered that the Defendant pay restitution in the amounts of $53,104.65 to Vanderbilt, $950.59 to the Erin Medical Facility, $243.36 for medications, and $6,498.00 in lost wages.

Following the sentencing hearing, the Defendant filed a motion for new trial, challenging the sufficiency of the evidence and the manner of service of the Defendant's sentence, including the fact that the trial court did not grant judicial diversion. The Defendant also asserted that the trial court erred in not declaring a mistrial when it found the Defendant's testimony untruthful and held the Defendant in contempt. The trial court denied the Defendant's motion for new trial. The Defendant timely appealed.

In his appeal, the Defendant challenges the sufficiency of the evidence and asserts that the trial court made improper comments regarding the Defendant's testimony. The Defendant also challenges the manner of service of his sentence.

**Analysis**

*Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Rather, "a

-14-

jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. Id. Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The Defendant asserts that the jury lacked sufficient evidence to convict him of aggravated assault given evidence of his belief that he was going to be attacked by the victim. The State disagrees.

Aggravated assault is defined as "intentionally, knowingly, or recklessly caus[ing] bodily injury to another" which results in "serious bodily injury" or where the defendant "[u]ses or displays a deadly weapon." Tenn. Code Ann. §§ 39-13-101, -102 (2006). A "deadly weapon" can be "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Id. § 39-11-106(5)(B) (2006).

In the case before us, numerous witnesses testified regarding the events surrounding the offense. The record established through their testimonies that on the night of December 26, 2008, the Defendant approached John who was near the property line dividing their two properties. As the Defendant approached, he acquired a stick or board that he eventually used to hit John at least two times. The Defendant, in his testimony, described the stick as a piece of edging from a sawmill. Deputy Batton testified that the object was a "one by one or one by two stick."

According to the Defendant and his sons, he struck John once, and then John wrapped his arms around the Defendant. The Defendant knocked John to the ground and simultaneously hit John at least one more time. Kevin, the Defendant's son, acknowledged that the Defendant might have hit John more than twice and was unsure whether John was conscious when the Defendant hit him at least one more time after the initial hit.

Based on the manner in which the Defendant used the stick to hit John repeatedly, we conclude that the evidence is sufficient to establish that the Defendant utilized a deadly weapon as defined by the statute. See Tenn. Code Ann. 39-11-106(5)(B); State v. Robinson,

971 S.W.2d 30, 48 (Tenn. Crim. App. 1997) (finding that for sentencing purposes, "[i]f the defendant had a stick or brick in his hand, he possessed a deadly weapon").

The Defendant also asserts that the evidence is insufficient to support his conviction because he established a self-defense claim. The Defendant testified that as he approached John, John began walking toward the Defendant with "something shiny" in his hand – an item which turned out to be a beer can. Further, the Defendant stated that he hit John when John "got into [his] face." In John's testimony, he did not remember getting hit. However, John testified that, as the Defendant approached, someone inquired about the time, and John looked at his cell phone and told the person what time it was. Then, turning around was the last thing he remembered before he woke up getting carried off the field. According to Gregory, the Defendant approached John and proceeded to hit John with the stick three times as John was in the process of turning back toward John's residence. Gregory did not recall seeing John threaten the Defendant or the Defendant's family.

To the extent that the testimonies differ regarding the events leading up to the Defendant's hitting John, we will not disturb the jury's implicit credibility findings. See State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) ("Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact . . . .") (citing State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999). Furthermore, "it is the jury's prerogative to reject self-defense." State v. Madden, 99 S.W.3d 127, 136 (Tenn. Crim. App. 2002) (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). Accordingly, the Defendant is not entitled to relief on this issue.

*Trial Court's Comments to Jury*

The Defendant also contends that the trial court improperly and prejudicially instructed the jury to consider an answer given by the Defendant to be an attempt to evoke sympathy from the jury. Furthermore, the Defendant insists that the trial court's comments prejudiced the Defendant and that this Court accordingly should grant the Defendant a new trial. The State asserts that the Defendant has waived this issue based on his failure to object to the comments at the time of trial and his failure to raise the same substantive issue in his motion for new trial. In the alternative, the State insists that the trial court's comments to the jury were proper.

Upon reviewing the record, we agree with the State that the Defendant failed to object to the trial court's comments or to seek a curative instruction at trial. Thus, the Defendant "effectively waive[d] the issue for appellate purposes." State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997); see also Tenn. R. App. P. 36. Additionally, the Defendant, in his motion for new trial, asserted that "[t]he Trial Court erred in not declaring a mistrial when

the Court found the Defendant in contempt. Upon the finding of contempt, the Trial Court could no longer function as a thirteenth juror." His issue now before this Court is that the trial court's comments prejudiced the Defendant. We note that in order to review an issue at the appellate level, that issue should "be *specifically* stated in a motion for a new trial in the lower court and decided adversely to the appellant; 'otherwise such assignments will be treated as waived.'" State v. Gauldin, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987) (quoting Tenn. R. App. P. 3(e)).

Nevertheless, even assuming that the Defendant properly preserved this for appellate review, the Defendant has failed to establish that he suffered any prejudice. Our supreme court has instructed a trial judge to "'be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or the credibility of evidence or which might sway the jury.'" State v. Hester, 324 S.W.3d 1, 89 (Tenn. 2010) (quoting State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989)); see also State v. Caughron, 855 S.W.2d 526, 536 (Tenn. 1993) ("It is axiomatic that a trial judge should exercise care not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial.") (citing Brooks v. State, 213 S.W.2d 7, 10 (Tenn. 1948)). Yet, "not every comment on the evidence made by a judge is grounds for a new trial." Mercer v. Vanderbilt Univ., Inc., 134 S.W.3d 121, 134 (Tenn. 2004). Rather, the inquiry is whether "the trial court's comment in the overall context of the case . . . was prejudicial." Id.

Here, the Defendant early in his testimony made an unsolicited comment that his family thought John "was on crack cocaine." The trial court warned the Defendant, outside the presence of the jury, to "answer the questions directly, simply and without elaboration. I will hold you in contempt and you will spend tonight in jail if you do another instance just like you have done." Later, on cross-examination, the following interaction took place:

Q: When did you first realize that your wife was there?

A: When Jason approached me coming up the driveway.

Q: I can't hear you.

A: I had throat cancer and my voice don't carry that well. When Jason –

General Lockert-Mash: I'm going to ask to instruct this witness once again not to testify outside of what the question is.

The Court: Ladies and gentlemen, will you step out in the jury room please.

. . . .

The Court: Mr. Hawkins, I have warned you on a previous occasion about making unsolicited comments. I find that you are in direct criminal contempt of the orders of this Court and I fine you fifty dollars. The next time I do it, it's going to involve incarceration.

. . . .

General Lockert-Mash: Your Honor, we'd ask that you instruct the jury to disregard that comment.

. . . .

The Court: Ladies and gentlemen, just before you left the courtroom, this defendant made an unsolicited comment concerning his physical condition. It was not a responsive response to a question asked and it was improper.

You may consider it to have been an attempt on the part of the defendant to incur your sympathy; but I will instruct you that even though that may have negatively affected you, I instruct you to disregard it; and not allow it to affect your verdict one way or the other.

You will be told in your final instructions that you are to arrive at a verdict without sympathy, prejudice or passion, can you do that?

When these comments are reviewed in the overall context, although some are improper, we do not believe that the trial court's comments prejudiced the Defendant. Indeed, the trial court specifically requested that the jury not allow the Defendant's comments to influence them one way or another. Thus, we find that the Defendant is entitled to no relief on this issue.

*Sentencing*

Lastly, the Defendant argues that the manner of his sentence is improper in that he should have received full probation.[3] The State asserts that the trial court's decision was

---

[3] Although the Defendant raised the trial court's denial of judicial diversion as an issue in his motion for new trial, on appeal he only challenges the trial court's denial of full probation.

detailed and reasoned and that full probation likely would depreciate the seriousness of the offense. We agree with the State.

In making its sentencing determination, a trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006). The trial judge also should consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5) (2006).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Susan Renee Bise, __ S.W.3d ___, ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at __, *20. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden

of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant challenges the trial court's imposition of a period of confinement. When a court determines the manner of service of a sentence, it no longer is presumed that a defendant is a favorable candidate for alternative sentencing under the revised Tennessee sentencing statutes. Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-102(6)). Rather, the advisory sentencing guidelines now provide that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann § 40-35-102(5)-(6)(A) (Supp. 2007). Additionally, a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. Id. § 40-35-102(6)(D).

In determining whether to impose a sentence of confinement, the trial court should consider the following:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Id. § 40-35-103(1) (2006); see also Carter, 254 S.W.3d at 347. Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2), (4). A trial court also should consider a defendant's potential for rehabilitation or lack thereof when determining the manner or length of the sentence. Id. § 40-35-103(5).

With regard to ordering the Defendant to serve one year in confinement, the trial court first noted that suspending the Defendant's sentence in full would depreciate the seriousness of the offense. Additionally, the court stated that it found the Defendant's trial testimony untruthful and his statement of allocution unconvincing and that the Defendant was lacking genuine remorse for his actions. Finally, the trial court found that, although full probation

would not serve the interest of the public, split confinement would be appropriate in this case.

We discern no error by the trial court in ordering the Defendant to serve one year in confinement. The trial court noted that the Defendant serving one year would have the same deterrent effect as the Defendant serving five years, and, thus, the court sentenced the Defendant to the least severe measure necessary to achieve the purposes of sentencing. See Tenn. Code Ann. § 40-35-103(2), (4). We conclude that the trial court's order of one year confinement is entirely appropriate. Accordingly, the Defendant is not entitled to relief as to this aspect of his sentence.

## **Conclusion**

For the foregoing reasons, we affirm the judgment of the trial court.


_____
JEFFREY S. BIVINS, JUDGE